UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SIGNATURE TECHNOLOGY SOLUTIONS, and | )<br>)<br>) |
| GARY GOODMAN, Individually, | )<br>)<br>) |
| Petitioners, | )<br>) |
| v. | ) Miscellaneous Action No. 13-0661 (RBW) |
| INCAPSULATE, LLC | )<br>)<br>) |
| Respondent. | )<br>) |

**MEMORANDUM OPINION**

Petitioners Signature Technology Solutions, LLC ("Signature") and Signature's President, Gary Goodman, move to stay the arbitration initiated by respondent Incapsulate, LLC ("Incapsulate"). Motion to Stay Arbitration at 1. Upon careful consideration of the parties' submissions, the Court grants in part and denies in part the petitioners' motion.

**I. BACKGROUND**

The following facts are undisputed unless otherwise noted. On March 13, 2009, Signature and Incapsulate executed an agreement for Incapsulate to provide certain services to Signature in support of Signature's contract with the District of Columbia Public Schools Office of Special Education ("2009 Agreement"). Memorandum of Points and Authorities in Support of Motion to Stay Arbitration ("Mem.") ¶ 35; Incapsulate, LLC's Opposition to Petitioners' Motion to Stay Arbitration ("Opp'n") at 2. The 2009 Agreement expired on December 31, 2009, but provided that "the term of [the] Agreement may be extended for up to two (2) option years by the parties in writing if the Prime Contract is extended in the same manner." Mem., Exhibit

1

("Ex.") 1, Ex. A (2009 Agreement) § 2.0. The 2009 Agreement also stated that it "shall be governed and construed in accordance with the laws of the Commonwealth of Virginia," id. § 20.0, and contained the following provision regarding the resolution of disputes:

> If any matter hereunder is subject to a dispute between the parties which cannot be resolved to their mutual satisfaction, either party, by a written request for arbitration delivered to the other, shall require that the matter be arbitrated in Northern Virginia, pursuant to the commercial arbitration rules of the American Arbitration Association ("AAA") then in effect. The arbitration decision and award shall be binding on the parties, and judgment thereon may be entered in any court of competent jurisdiction.

Id. § 13.0. Ajay Batish, the CEO of Incapsulate, and Gary L. Goodman, the CEO of Signature, signed the 2009 Agreement on behalf of their respective companies. Id. at 6.

The parties' positions as to what occurred after the 2009 Agreement was signed diverge considerably. Signature contends that "the parties had serious issues regarding contract management and billing" while the 2009 Agreement was in effect, Mem. ¶ 37, and that after its expiration, Signature and Incapsulate "continued to operate with no agreement in place while they negotiated a new contract," id. ¶¶ 38–40. According to Signature, "[o]n or about June 15, 2010, . . . Incapsulate sent an email to Mr. Goodman stating that it needed a [Signature] contract for immigration purposes" because "Incapsulate needed to provide a contract and letter signed by [Signature] to its immigration lawyer to assist one of Incapsulate's employees, Abhinav Duda, with a H1B [visa] application." Id. ¶¶ 44–45. Signature alleges that "[t]he email also made clear that Incapsulate only changed the dates on the 2009 Agreement as well as the Statement of Work and requested that [Signature] sign the agreement to assist with the immigration issue." Id. ¶ 47. "[I]n response to Incapsulate's request," on June 21, 2010, Goodman executed the agreement sent by Incapsulate ("2010 Agreement"). Id. ¶ 48. Signature asserts that "[i]t was clear to both parties that they did not intend to be bound by the 2010 Agreement with the terms included

therein" and that Incapsulate never returned an executed copy of the agreement to Signature. Id.
¶ 49. Signature contends that "[i]n fact, on [June][1] 16, 2010, [it] sent an email to Incapsulate
stating that it had questions about the 2010 Agreement." Id. ¶ 50. Thereafter on June 24, 2010,
Signature "sent another email to Incapsulate confirming that it no longer had questions regarding
the 2010 Agreement because Incapsulate did not intend to execute the 2010 Agreement as it was
attempting to become the prime contractor on the contracts and was currently looking for office
space in the District" and that "Incapsulate agreed to 'hold off on the agreement and revisit the
terms.'" Id. ¶¶ 51–52. According to Signature, "the parties continued to work together with no
agreement in place," id. ¶ 53, and then, "[i]n early 2011, the parties began negotiating a master
subcontracting agreement to govern their relationship in all instances," id. ¶ 55. Signature
contends that

> once again, the parties were unable to agree on certain terms including, but not limited to[:] (1) [the] percentage share to be paid to each party; (2) whether the current arrangement between the parties would allow [Signature] to become compliant with District law; (3) the amount to be paid to legal counsel to bring the contract into compliance with District law; and (4) jurisdiction and venue in the event of legal disputes between the parties.

Id. ¶ 56.

Incapsulate recounts an entirely different series of events. According to Incapsulate,
"[o]n or about January 21, 2010, the parties extended their contractual relationship for the period
ending December 31, 2010" and that the contract was signed by Goodman and a representative
of Incapsulate, Brianna Burnell,[2] on June 21, 2010. Opp'n at 2. Incapsulate contends that it

---

[1] Signature's memorandum states that this email was sent on July 16, 2010, citing its own Exhibit 3 for support, Mem. ¶ 50, which actually shows that the email was sent on June 16, 2010, Mem., Ex. 3 (Email Correspondence June 15–24, 2010) at 4. The Court therefore assumes that the July designation of the email in the memorandum is a typographical error and that the intended designation for the month of the email was June.

[2] Brianna Burnell was "known" as Brianna Kirtley at the time of the events discussed in this opinion. Opp'n at 2 & n.1. For ease of reference, the Court will therefore refer to her as Brianna Burnell throughout this opinion and all quotations will be altered to conform to this designation.

3

"intended to be bound to the terms of the June 21, 2010 contract and any modifications thereto," and "[a]t no time did [it] agree to 'hold off' on the agreement signed by Mr. Goodman and Ms. [Burnell] on or about June 21, 2010." Id. at 2–3. Incapsulate further asserts that the contract between Signature and the District of Columbia Public Schools "was subsequently extended into 2011 through a series of quarterly memorandum agreements which incorporated the terms of the 2010 agreement" and that "[i]n response, Incapsulate and [Signature] continued the course of their relationship in 2011 as if their 2010 subcontract was still in place." Id. at 3.

The purported 2010 Agreement is dated January 21, 2010. Mem., Ex. 1, Ex. B (2010 Agreement) at 1; Opp'n, Ex. 2, Ex. A (2010 Agreement) at 1.[3] The purported 2010 Agreement states that it expires on December 31, 2010, but provides that "[t]he term of this Agreement may be extended for up to two (2) option years by the parties in writing if the Prime Contract is extended in the same manner." Mem., Ex. 1, Ex. B (2010 Agreement) § 2.0. It contains the same arbitration and choice-of-law provisions as the 2009 Agreement. See id. §§ 13.0, 20.0. The copy of the purported 2010 Agreement attached to the Statement of Claim before the AAA is signed only by Goodman, with his signature dated June 21, 2010. Id. at 6. On the other hand, Incapsulate has submitted with its opposition to the Motion to Stay Arbitration a copy of the purported 2010 Agreement which also contains the signature of Brianna Burnell, dated June 21, 2010. Opp'n, Ex. 2, Ex. A (2010 Agreement) at 6. In response to Incapsulate's production of this document, the petitioners allege that Burnell either recently signed the agreement or that she never sent the executed copy to Signature. Mem. ¶ 76 n.1. Incapsulate also submitted with its opposition an affidavit from Burnell, in which she states that she executed the contract on June

---

[3] The copies of the 2010 Agreement attached to each party's submissions are identical, with the exception of the signature of Brianna Burnell, which is contained only on the copy submitted by Incapsulate. For ease of reference, all subsequent citations to the purported 2010 Agreement will be to the exhibit attached to the petitioners' memorandum, unless referring to this discrepancy.

4

21, 2010 and that she "ha[s] no reason to believe that [the] [p]etitioners did not receive a copy of the contract [she] signed on or about June 21, 2010." Opp'n, Ex. 3 (Affidavit of Brianna Burnell ("Burnell Aff.")) ¶¶ 3, 10. Moreover, Burnell states that "[i]t would be [her] habit and custom to send a copy of the executed agreement to the other party as soon as it had been signed." Id. ¶ 10.

Signature and Incapsulate ended their relationship in late 2011. Mem. ¶ 58; Opp'n at 3. Incapsulate subsequently initiated arbitration proceedings against Signature and Goodman before the AAA seeking payment for work allegedly performed in 2010 and 2011. Mem. ¶ 59; Opp'n, Ex. 1 (Statement of Claim) at 1, ¶¶ 30–76. Signature and Goodman informed Incapsulate and the AAA "that [they] did not intend to participate in arbitration and stat[ed] unequivocally that they would seek the [C]ourt's opinion on the question of whether there is an agreement to arbitrate." Mem. ¶ 70. Their motion seeking to stay the arbitration proceedings initiated by Incapsulate followed.

## II. LEGAL STANDARD

A motion to compel arbitration pursuant to § 4 of the Federal Arbitration Act ("FAA"),[4] 9 U.S.C. §§ 1–16 (2012), is determined in accordance with the summary judgment standard of Federal Rule of Civil Procedure 56, "as if it were a request for 'summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate.'" Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc., 531 F.3d 863, 865 (D.C. Cir. 2008) (citations omitted). While motions to stay arbitration proceedings are not contemplated by § 4, the analysis of a claim for such relief is essentially the same as when analyzing a motion to compel arbitration because the argument that "no agreement to arbitrate was entered . . . effectively

---

[4] Although the parties do not address whether the contracts at issue here fall within the purview of the FAA, both parties have analyzed the issues under the framework of the FAA, and thus, the Court concludes that they agree that the FAA applies here.

raises the issue whether there was a meeting of the minds on the agreement to arbitrate." Booker v. Robert Half Int'l, Inc., 315 F. Supp. 2d 94, 99 (D.D.C. 2004), aff'd, 413 F.3d 77 (D.C. Cir. 2005). Thus, "the summary judgment standard is appropriate in cases where the District Court is required to determine arbitrability, regardless of whether the relief sought is an order to compel arbitration or to prevent arbitration." Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003). Irrespective of how the filings before the Court are styled, both seek "summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate" requiring Signature and Goodman to participate in arbitration, and accordingly, the Court will treat the motion and opposition as the equivalent of cross-motions for summary judgment. See Aliron Int'l, 531 F.3d at 865 (internal quotation marks omitted).

Federal Rule of Civil Procedure 56 provides that summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," based upon the depositions, affidavits, and other factual materials in the record. Fed. R. Civ. P. 56(a), (c). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disputes about facts that are "irrelevant or unnecessary" to the issue at hand do not affect the summary judgment analysis. Id. The moving party bears the initial burden of showing the absence of a disputed material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In determining whether there is a genuine issue of material fact which would preclude summary judgment, "[t]he evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences in favor of the nonmoving party." Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011) (citing Anderson, 477 U.S. at 255). However, "[t]he

mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to avoid summary judgment. Anderson, 477 U.S. at 252.

### III. ANALYSIS

Congress's "preeminent concern" in enacting the FAA was to enforce private agreements to arbitrate, "a concern which requires that [courts] rigorously enforce agreements to arbitrate." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 625–26 (1985) (citation and internal quotation marks omitted). Section 2 of the FAA provides that:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . or the refusal to perform the whole or any part thereof, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. While this provision embodies "a liberal federal policy favoring arbitration agreements," Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983), "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit," Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002) (citations and internal quotation marks omitted).

It is well-established that "the question of arbitrability—whether a [particular] agreement creates a duty for the parties to arbitrate the particular grievance—is undeniably an issue for judicial determination." AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986). Here, the petitioners challenge the validity of the 2010 Agreement, the existence of an agreement to arbitrate claims arising after the expiration of the 2010 Agreement, and the permissibility of pursuing claims against Goodman individually, see Mem. ¶¶ 71–80, challenges that fall squarely within this Court's purview absent the parties' agreement to the contrary, Howsam, 537 U.S. at 83–84. Citing First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938

(1995), the petitioners contend that "[t]he question of whether the parties have agreed to arbitrate is generally resolved in favor of the party opposing arbitration." Mem. ¶ 9. Incapsulate responds that "'[f]ederal policy requires courts to construe arbitration clauses as broadly as possible and any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" Opp'n at 4 (quoting Bedroc Contracting LLC v. Mason Tenders Dist. Council of Greater New York & Long Island, No. 06 Civ. 6399 (RMB), 2006 WL 3057311, at *2 (S.D.N.Y. Oct. 25, 2006)).

Neither of these presumptions applies here, however. The petitioners misconstrue the Supreme Court's directive in First Options that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." 514 U.S. at 944 (emphasis added) (second and third alterations in original) (citation omitted). This presumption applies not to the question of "whether the parties have agreed to arbitrate" generally, Mem. ¶ 9, but rather to whether they agreed that the arbitrator—rather than a court—will determine whether a particular question is subject to arbitration. Incapsulate does not contend that the arbitration clause contained in the purported 2010 Agreement requires that the question of arbitrability itself be submitted to the arbitrator, and thus, the heightened standard articulated in First Options is irrelevant here. Incapsulate, on the other hand, misconstrues the presumption in favor of arbitration, which applies when determining the scope of the issues encompassed by an arbitration clause in a valid and enforceable contract. See Moses H. Cone Mem'l Hosp., 460 U.S. at 24–25 ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."); see also First Options, 514 U.S. at 944–45 (discussing the rationale for applying opposing

8

presumptions to the questions of which tribunal should determine arbitrability and the scope of arbitrable issues encompassed by a given arbitration provision). Here, the petitioners challenge the validity of a purported contract which contains an arbitration clause, not the scope of issues encompassed by this clause, and therefore, the presumption in favor of arbitrability also does not apply.

In determining whether parties entered a valid and enforceable agreement to arbitrate, courts apply state contract law "if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 630–31 (2009) (citations and internal quotation marks omitted); see First Options, 514 U.S. at 944 ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." (citations omitted)).

Neither party has briefed the question of which state's law applies to determine the existence of the parties' alleged agreement to arbitrate. The purported 2010 Agreement provides that the agreement "shall be governed and construed in accordance with the laws of the Commonwealth of Virginia," Mem., Ex. 1, Ex. B (2010 Agreement) § 20.0, but Incapsulate has relied on both Virginia and District of Columbia law in its brief. The petitioners rely on District of Columbia law but provide no analysis for why the law of the District governs. In a diversity case such as this one, federal courts apply the choice-of-law rules of the jurisdiction in which they sit. Stephen A. Goldberg Co. v. Remsen Partners, Ltd., 170 F.3d 191, 193 (D.C. Cir. 1999) (citation omitted). While District of Columbia courts will "give effect to contractual choice of laws provisions as long as there is some reasonable relationship with the state specified," PCH Mut. Ins. Co. v. Cas. & Sur., Inc., 569 F. Supp. 2d 67, 72 (D.D.C. 2008) (citation and internal

9

quotation marks omitted), the petitioners here challenge the validity of the purported contract containing the choice of law provision. Because "it would be premature to enforce the choice of law provision before deciding whether an agreement exists," Amirmotazedi v. Viacom, Inc., 768 F. Supp. 2d 256, 261 n.2 (D.D.C. 2011), the Court must first determine the applicable law without regard to the choice-of-law provision in the purported 2010 Agreement. Under District of Columbia choice-of-law principles, "'[t]he absence of a true conflict compels the application of District of Columbia law by default.'" Brown v. Dorsey & Whitney, LLP, 267 F. Supp. 2d 61, 70 (D.D.C. 2003) (Walton, J.) (citation omitted). Thus, because Virginia and District of Columbia law on the issues addressed in this opinion do not conflict, the Court will apply the law of the District of Columbia.[5] The Court now turns to the petitioners' arguments in support of their motion to stay the arbitration proceedings initiated by Incapsulate.

### A. Incapsulate's 2010 Claims

The petitioners contend that claims arising from work performed during 2010 are not subject to arbitration because the purported 2010 Agreement was never consummated. Mem. ¶¶ 73–76. The petitioners first argue that because Incapsulate did not return a signed copy of the agreement to Signature, the agreement never became effective. Id. ¶ 73. Incapsulate counters with the affidavit of Brianna Burnell, an Incapsulate employee in 2010, who represents that she signed the 2010 Agreement on behalf of Incapsulate on June 21, 2010, Opp'n, Ex. 3 (Burnell Aff.) ¶ 3, and that she "ha[s] no reason to believe that [the] [p]etitioners did not receive a copy of the contract" because "[i]t would be [her] habit and custom to send a copy of the executed agreement to the other party as soon as it had been signed," id. ¶ 10. The petitioners offer no evidence to support their conclusory assertion that the purported 2010 Agreement "was recently signed and/or was never sent to [Signature]," Mem. ¶ 76 n.1, to counter Burnell's affidavit, as

---

[5] This opinion will nonetheless include parallel citations to Virginia law when they exist.

10

they must to prevail on summary judgment.  Finding no contradictory evidence in the record, the Court thus concludes that Burnell signed the contract on June 21, 2010.  See United States ex rel. D.L.I. Inc. v. Allegheny Jefferson Millwork, LLC, 540 F. Supp. 2d 165, 172 (D.D.C. 2008).

However, even if it is true, as the petitioners assert, that Incapsulate never signed and returned the purported 2010 Agreement, one party's failure to sign an agreement does not invalidate it if the parties' conduct manifests assent to the terms of the contract.  See Davis v. Winfield, 664 A.2d 836, 838 (D.C. 1995); Orbis, Inc. v. ObjectWin Tech., Inc., No. 7:06CV00372, 2007 WL 2746958, at *4 (W.D. Va. Sept. 20, 2007) (citing Galloway Corp. v. S.B. Ballard Constr. Co., 250 Va. 493, 505 (1995)).  The petitioners do not dispute that Goodman, on behalf of Signature, signed the 2010 Agreement on June 21, 2010 and sent it to Incapsulate, see Mem. ¶ 48; see also Mem., Ex. 1, Ex. B (2010 Agreement) at 6, or that Incapsulate continued to perform the work contemplated in the contract after receiving the signed 2010 Agreement from Goodman, see Mem. ¶ 53.  And while it is true, as the petitioners note, id. ¶ 73, that the 2010 Agreement includes the recitation before the signature blocks for each party that "In Witness Whereof, each of the parties has caused this Agreement to be executed and delivered by its duly authorized officers as of the day and year first above written," Mem., Ex. 1, Ex. B (2010 Agreement) at 6, this statement does not make effectiveness of the agreement contingent upon execution and delivery of the agreement.  Incapsulate thus manifested its assent to the 2010 Agreement by performing the work contemplated by the contract, and therefore, its alleged failure to sign and return the document does not render the agreement ineffective.

The petitioners argue that, in any event, neither party intended to be bound by the 2010 Agreement which was, according to the petitioners, only executed by Signature "to get

11

immigration assistance for one of Incapsulate's employees." Mem. ¶ 73. In the petitioners' view, there was no "meeting of the minds" between the parties as to the terms of the 2010 Agreement, as demonstrated by "the parties' continued negotiations, in 2011, of the terms by which the parties would be paid for work performed in 2010." Id. ¶¶ 73–76. It is well-established, however, that "a signature on a contract indicates 'mutuality of assent' and a party is bound by the contract unless he or she can show special circumstances relieving him or her of such an obligation." Emeronye v. CACI Int'l, Inc., 141 F. Supp. 2d 82, 86 (D.D.C. 2001) (collecting cases under District of Columbia and Virginia law). Both the District of Columbia and Virginia adhere to the "objective" law of contracts,

> which generally means that the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, [regardless] of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress, or mutual mistake.

DSP Venture Grp., Inc. v. Allen, 830 A.2d 850, 852 (D.C. 2003) (alteration in original) (emphasis added) (citation and internal quotation marks omitted); see also Metro Realty of Tidewater, Inc. v. Woolard, 223 Va. 92, 99 (1982) (holding that businessman who entered into contract that did not provide for interest payments was bound by the contract despite his intention at the time of execution for the contract to require interest payments). Indeed, "[a] party's 'claimed intent is immaterial, where it has agreed in writing to a clearly expressed and unambiguous intent to the contrary.'" Hart v. Vt. Inv. Ltd. P'ship, 667 A.2d 578, 583 (D.C. 1995) (emphasis added) (citation omitted). It is undisputed that Goodman signed the 2010 Agreement on behalf of Signature, see Mem. ¶ 48; see also Mem., Ex. 1, Ex. B (2010 Agreement) at 6, and the petitioners have not alleged fraud, duress, or mutual mistake in his execution of the 2010 Agreement. As discussed above, Incapsulate continued to perform the

12

work contemplated by the 2010 Agreement after Goodman signed it, see Mem. ¶ 53, and has produced evidence that Brianna Burnell signed the 2010 Agreement on Incapsulate's behalf at or around the same time as Goodman. Nor does the parties' ongoing discussion of the terms of their relationship negate their earlier written agreement. See Owen v. Owen, 427 A.2d 933, 938 (D.C. 1981) (enforcing agreement despite provision allowing for future renegotiation of the terms of the agreement and the parties' continued negotiations following execution of the agreement). There is thus no basis for the Court to conclude that the parties did not intend to be bound to the 2010 Agreement when they signed it, regardless of their alleged intent at the time.

The petitioners contend, however, that even if the Court finds that Signature and Incapsulate entered into a binding agreement, the 2010 Agreement is void ab initio because, in the petitioners' view, the agreement is illegal under District of Columbia law. Mem. ¶¶ 79–80. Such a challenge, however, must be decided by the arbitral tribunal rather than this Court, and therefore provides no basis for staying the arbitration proceedings initiated by Incapsulate. See Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 445–49 (2006) (holding that arbitrator and not court must resolve challenge that contract containing arbitration clause was void ab initio because it violated state lending and consumer protection laws). Accordingly, the Court finds that the 2010 Agreement is binding and mandates arbitration of any claims arising under it. The Court thus denies the petitioners' motion to stay arbitration proceedings as to claims against Signature involving work performed in 2010.

### B. Incapsulate's 2011 Claims

Incapsulate also seeks to arbitrate claims arising from work performed in 2011. Opp'n at 7–8. By its terms, the 2010 Agreement expired on December 31, 2010, Mem., Ex. 1, Ex. B (2010 Agreement) § 2.0, and it is undisputed that the parties neither executed a written

agreement in 2011 nor agreed in writing to extend the 2010 Agreement,[6] Opp'n at 3. Incapsulate contends that claims arising from work performed in 2011 are nonetheless subject to arbitration because Signature and Incapsulate "continued doing business with one another as if the 2010 subcontract signed by [Brianna Burnell] remained in place" and thus "it would have been reasonable for Incapsulate to believe that disputes arising between the parties during their continued course of business in 2011 were to be arbitrated." Id. at 8. As the party asserting the existence of an agreement to arbitrate its 2011 claims, Incapsulate bears the burden of establishing that an agreement between the parties existed. PCH Mut. Ins. Co., 569 F. Supp. 2d at 73. Under District of Columbia law, "'a contract is not formed unless the parties reach an accord on all material terms and indicate an intention to be bound.'" Id. (quoting Jack Baker, Inc. v. Office Space Dev. Corp., 664 A.2d 1236, 1238 (D.C. 1995)); see Phillips v. Mazyck, 273 Va. 630, 636 (2007).

The mere continuation of the working relationship between Signature and Incapsulate does not demonstrate the existence of an agreement to arbitrate disputes arising in 2011. Parties to a contract "have it within their power to specify the date and hour at which their obligation to arbitrate is to end" and "[w]here they have done so, there is nothing fairly arguable to refer to arbitration." Nat'l R.R. Passenger Corp. v. Bos. & Me. Corp., 850 F.2d 756, 762 (D.C. Cir. 1988). The 2010 Agreement provides for the arbitration of "any matter hereunder," Mem., Ex.

---

[6] As the petitioners note, Mem. ¶ 77, Incapsulate's Statement of Claim before the AAA asserts that "[u]pon expiration of the 2010 agreement between the parties, their contractual relationship with regard to the District of Columbia Public Schools, Office of Special Education, prime contract was subsequently extended into 2011 through a series of quarterly memorandum agreements which incorporated the terms of the 2010 agreement," Mem., Ex. 1 (Statement of Claim) ¶ 8. And the petitioners dispute the existence of any memorandum agreements between Signature and Incapsulate extending their 2010 Agreement. Mem. ¶ 77. In its filing before this Court, Incapsulate does not claim the existence of any such agreements between Signature and itself, stating instead that "the contractual relationship between [Signature] and the District of Columbia with regard to the District of Columbia Public Schools, Office of Special Education, prime contract was subsequently extended into 2011 through a series of quarterly memorandum agreements which incorporated the terms of the 2010 agreement," and that Signature and Incapsulate "continued the course of their relationship in 2011 as if their 2010 subcontract was still in place." Opp'n at 3 (emphasis added). Accordingly, the Court finds that it is undisputed that Signature and Incapsulate continued to work together in 2011 without a written contract between them in place.

14

1, Ex. B (2010 Agreement) § 13.0, and for the expiration of the agreement on December 31, 2010, id. § 2.0. The 2010 Agreement states that the term "may be extended for up to two (2) option years by the parties in writing if the Prime Contract is extended in the same manner." Id. (emphasis added). Under the plain language of the 2010 Agreement, the only disputes subject to arbitration are matters arising under the 2010 Agreement, which expired on December 31, 2010. And under the 2010 Agreement, the term may only be extended in writing.

The Court finds no basis to ignore the express provisions of the parties' 2010 Agreement, or to assume that the continuation of their working relationship manifests their intent to operate under the same terms as the 2010 Agreement. See Bogen Commc'ns, Inc. v. Tri-Signal Integration, Inc., No. 04-6275(WGB), 2006 WL 469963, at *4 (D.N.J. Feb. 27, 2006) ("The fact that Bogen and Tri-Signal continued their business relationship does not mean that the same rights and obligations under the expired contract persisted."). In fact, prior to terminating their business relationship in late 2011, it appears that Signature and Incapsulate were engaged in negotiations over the terms of an agreement for work performed in 2011, indicating that the parties did not intend to operate under the terms of the 2010 Agreement. See Mem. ¶ 77 (asserting that the parties continued negotiations but were unable to agree on "the percentage to be paid to the parties as well as the jurisdiction, venue, and governing law in the event of disputes"); Opp'n, Ex. 1 (Statement of Claim) ¶ 9 (alleging that the parties agreed that Signature would receive an increased commission of 8%). Thus, even ignoring the provision of the 2010 Agreement requiring that any extension of the agreement be reduced to writing, the parties' lack of agreement as to such central terms as payment indicates that Signature and Incapsulate failed to reach agreement on the material terms of a contract to govern work performed in 2011.

Disputes over matters arising outside of the 2010 Agreement are thus clearly outside the ambit of the arbitration provision contained in that contract.

The cases cited by Incapsulate in support of its argument on this point are inapposite. Ficek v. Southern Pacific Co., 338 F.2d 655 (9th Cir. 1964), Jaffe v. Nocera, 493 A.2d 1003 (D.C. 1985), and Coventry Teachers' Alliance v. Coventry School Committee, 417 A.2d 886 (R.I. 1980), cited by Incapsulate for the proposition that "'[a] party's willingness to arbitrate a specific issue need not be express but may be implied from the conduct of the parties,'" Opp'n at 7 (alteration in original) (quoting Coventry Teachers' Alliance, 417 A.2d at 889), all concern whether a party may later challenge arbitration proceedings on the ground that matters beyond the scope of the arbitration provision were addressed when that party has already voluntarily submitted to arbitration, see Ficek, 338 F.2d at 656 ("Even if the initial arbitration clause was not broad enough to include Ficek's claim, by voluntarily submitting the dispute to arbitration, Ficek and the railway 'evinc(ed) a subsequent agreement for private settlement which would cure any defect in the arbitration clause.'") (citation omitted); Jaffe, 493 A.2d at 1010–11 ("By his conduct, therefore, Nocera effectively consented to the scope of Jaffe's arbitral submission, and waived vacatur of the award on arbitrability grounds."); Conventry Teachers' Alliance, 417 A.2d at 889 ("The committee cannot now complain that the panel exceeded its powers when it agreed to and voluntarily participated in the very issue submitted to and decided by the panel."). And Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840 (2d Cir. 1987), and Southern Electrical Services, Inc. v. Cornerstone Detention Products, Inc., No. 7:10CV00076, 2010 WL 2233664 (W.D. Va. June 3, 2010), cited by Incapsulate to support its argument that an agreement for arbitration may be implied from the course of conduct between the parties, Opp'n at 8, both involve whether a party resisting arbitration can be held to an arbitration agreement in a written,

16

unsigned agreement exchanged between the parties under which business was subsequently transacted, Genesco, 815 F.2d at 845–46 (holding that party resisting arbitration was bound to arbitration provision in written sales forms exchanged between the parties even though some forms were unsigned); S. Elec. Servs., 2010 WL 2233664, at *5–6 (holding that party was bound to arbitration clause in contract that was not signed by the party resisting arbitration because its conduct in performing the contract manifested its assent to the terms). None of these cases are factually analogous. The petitioners here are not belatedly challenging the parameters of an arbitration clause after already submitting the dispute to arbitration—in fact, the petitioners have lodged their objection to participating in arbitration proceedings at every opportunity—and there is no written but unsigned contract exchanged between the parties to govern their relationship after the expiration of the 2010 Agreement on December 31, 2010. Here, there is simply no written agreement governing 2011 disputes at all. Incapsulate has cited no authority finding an agreement to arbitrate under such circumstances, and the Court has found none. Incapsulate has therefore failed to satisfy its burden of proving the existence of an agreement to arbitrate claims that do not arise under the 2010 Agreement.

### C. Arbitration Against Gary Goodman

Finally, with respect to the arbitration demand filed against Goodman individually, the petitioners argue that Goodman "never entered into an agreement, written or otherwise, with Incapsulate to conduct business, much less to arbitrate any claims that may arise between the parties," and that he is shielded from personal liability because he was acting in the capacity of president of Signature at all relevant times. Mem. ¶ 71. Incapsulate, however, seeks to hold Goodman personally liable by piercing the corporate veil. Opp'n at 9–10. "A nonsignatory to an arbitration agreement may be bound by that agreement under traditional principles of contract

and agency law," including application of the veil piercing doctrine. <u>Oehme, van Sweden & Assocs., Inc. v. Maypaul Trading & Servs. Ltd.</u>, 902 F. Supp. 2d 87, 97 (D.D.C. 2012) (citing <u>Arthur Andersen</u>, 556 U.S. at 631). Incapsulate may therefore proceed with arbitration against Goodman individually if it can satisfy the requirements for piercing the corporate veil under state law, a determination that raises a "question of arbitrability" for this Court to decide. <u>See</u> <u>Howsam</u>, 537 U.S. at 84; <u>see also</u> <u>First Options</u>, 514 U.S. at 943–46 (holding that court must determine whether individuals who did not sign contract containing arbitration provision were nonetheless bound by it). The factual record on this issue, however, is insufficiently developed for this Court to make such a determination. Accordingly, the petitioners' motion to stay arbitration proceedings against Goodman is denied without prejudice pending a determination of whether such relief is ultimately warranted following the development of a more informed record on the matter.

### IV. CONCLUSION

For the foregoing reasons, the Court finds that claims against Signature arising under the 2010 Agreement are subject to arbitration but that genuine disputes about material issues of fact preclude this Court from determining whether Goodman is subject to arbitration pursuant to the 2010 Agreement in his individual capacity. The Court further finds that there is no agreement to arbitrate claims against the petitioners that do not arise under the 2010 Agreement, and accordingly the petitioners' motion as to Incapsulate's 2011 claims must be granted.

**SO ORDERED** this 17th day of July, 2014.[7]

REGGIE B. WALTON<br>
United States District Judge

---

[7] An order consistent with this memorandum opinion will be issued contemporaneously.